#597422                                                                          5445-6

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARBARA M. DEPASQUALE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:13-CV-01073 (AWT) (DFM) |
| | ) | |
| v. | ) | Hon. Alvin W. Thompson |
| | ) | |
| DUNKIN' BRANDS, INC., DD IP | ) | Magistrate Judge Donna F. Martinez |
| HOLDER LLC, and DUNKIN' BRANDS | ) | |
| GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | February 19, 2014 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .................................................................... 1

II.  FACTUAL BACKGROUND ...................................................................... 2

    A.  Dunkin's Due Diligence in Enforcing its Intellectual Property Rights ....................... 2

    B.  DePasquale's Sale of Dunkin' K-Cups ...................................................... 5

III. ARGUMENT .......................................................................................... 6

    A.  Standard of Review for Summary Judgment ............................................... 6

    B.  DePasquale Cannot Prove the Elements of Tortious Interference With Contract ........ 8

    C.  DePasquale Cannot Prove the Elements of Tortious Interference With Prospective
       Business Advantage ...................................................................... 9

    D.  Dunkin' is Entitled to Judgment on the CUTPA Claim ................................... 9

       1.  Dunkin' Had an Objective Good Faith Basis for its Conduct ............................ 10

       2.  The Evidence Shows that Dunkin' Implements Legitimate Quality
          Controls ................................................................................ 13

       3.  Dunkin's Exercise of its Legal Rights Cannot Form a Basis for Violation of
          CUTPA ................................................................................ 15

       4.  Enforcement of Dunkin's Intellectual Property Rights Benefits
          Consumers ............................................................................. 18

    E.  The Unauthorized Resale of Dunkin' K-Cups Constitutes Trademark
       Dilution .................................................................................. 19

IV.  CONCLUSION ...................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A-G Foods, Inc. v. Pepperidge Farm, Inc.*,
    216 Conn. 200 (1990) ........................................................................ 10

*Ahava, Inc. v. J.W.G. Ltd.*,
    250 F.Supp.2d 366 (S.D. N.Y. 2003) ................................................ 12

*Ancona v. Manafort Bros.*,
    56 Conn. App. 701 (2000) ................................................................ 15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................... 6, 7

*Appleton v. Bd of Educ. of Town of Stonington*,
    254 Conn. 205 (2000) ........................................................................ 8

*Aslanidis v. United States Lines, Inc.*,
    7 F.3d 1067 (2d Cir. 1993) ................................................................ 7

*Barq's, Inc. v. Barq's Beverages, Inc.*,
    677 F.Supp. 449 (E.D. La. 1987) .................................................... 17

*Biro v. Hirsch*,
    62 Conn. App. 11 (2001) .................................................................... 9

*Blake v. Levy*,
    191 Conn. 257 (1983) .................................................................... 8, 9

*Bose Corp. v. Ejaz,*
    2012 U.S. Dist. LEXIS 130953 (D. Mass.) ...................................... 20

*Burberry Ltd. v. Euro Moda, Inc.*,
    2009 U.S. Dist. LEXIS 53250 (S.D. N.Y.) ................................. 20, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................... 6

*Consolidated Insurers, Inc. v. Winch*,
    2004 Conn. Super. LEXIS 2785 (Conn. Super. Ct.) ........................ 16

*Dan-Foam A/S and Tempur-pedic, Inc. v. Brand Named Beds, LLC*,
    500 F.Supp.2d 296 (S.D. N.Y. 2007) ......................................... 11, 22

*De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*,
   269 Conn. 424 (2004) ......................................................................... 10

*DIRECTV, Inc. v. Lewis*,
   2005 U.S. Dist. LEXIS 8187 (W.D. N.Y.) ........................................... 17

*El Greco Leather Products Co., Inc. v. Shoe World, Inc.*,
   806 F.2d 392 (2d  Cir. 1986)........................................................... 11, 12

*Gallo v. Prudential Residential Servs.*,
   22 F.3d 1219 (2d Cir. 1994)................................................................... 7

*Gomes v. Commercial Union Ins. Co.*,
   258 Conn. 603 (2001) ......................................................................... 18

*Hammel v. Eau Galle Cheese Factory*,
   407 F.3d 852 (7th Cir. 2005) ................................................................. 8

*Heller, Inc. v. Design Within Reach, Inc.*,
   2009 U.S. Dist. LEXIS 71991 (S.D. N.Y.)......................................... 20

*Hormel Foods Corp. v. Jim Henson Productions, Inc.*,
   73 F.3d 497 (2d Cir. 1996).................................................................. 22

*Howard v. Gleason Corp.*,
   901 F.2d 1154 (2d Cir. 1990)................................................................ 7

*Jaramillo v. Weyerhaeuser Co.*,
   536 F.3d 140 (2d Cir. 2008)................................................................. 7

*Kraft Foods Group Brands, LLC v. Cracker Barrel Old Country Store, Inc.*,
   735 F.3d 735 (7th Cir. 2013) ......................................................... 10, 13

*L'Oreal USA, Inc. v. Trend Beauty Corp.*,
   2013 U.S. Dist. LEXIS 115795 (S.D. N.Y.)........................................ 20

*Malletier v. Dooney & Bourke, Inc.*,
   500 F.Supp.2d 276 (S.D. N.Y. 2007)................................................... 19

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................... 6, 7

*Mesnick v. Gen. Elec. Co.*,
   950 F.2d 816 (1st Cir. 1991)................................................................. 7

*Milso Industries Corp. v. Nazzaro*,
   2012 U.S. Dist. LEXIS 123999 (D. Conn.) ..................................... 9, 17

*Mishawaka Rubber & Woolen Co. v. S.S. Kresge Co.*,
    316 U.S. 203 (1942) ............................................................................... 10

*Polymer Technology Corp. v. Mimran*,
    37 F.3d 74 (2d Cir. 1994) ..................................................................... 12

*Primetime 24 Joint Venture v. NBC*,
    219 F.3d 92 (2d Cir. 2000) .................................................................... 17

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................. 17

*Robert S. Weiss & Assoc., Inc. v. Wiederlight*,
    208 Conn. 525 (1988) ............................................................................. 8

*Scandia Down Corp. v. Euroquilt, Inc.*,
    722 F.2d 1423 (7th Cir. 1985) .............................................................. 18

*Shell Oil Co. v. Commercial Petroleum*,
    928 F.2d 104 (4th Cir. 1991) ................................................................ 11

*Sportsmen's Boating Corp. v. Hensley*,
    192 Conn. 747 (1984) ............................................................................. 9

*Star Child II, LLC v. Lanmar Aviation, Inc.*,
    2013 U.S. Dist. LEXIS 36476 (D. Conn.) ........................................... 10

*Stern v. Trustees of Columbia Univ.*,
    131 F.3d 305 (2d Cir. 1997) ................................................................... 7

*Suburban Restorations Co., Inc. v. ACMAT Corp.*, 19
    700 F.2d 98 (2d Cir. 1983) ................................................................... 16

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    600 F.3d 93 (2d Cir. 2010) ................................................................... 19

*U.S. Jaycees v. Phila. Jaycees*,
    639 F.2d 134 (3rd Cir. 1981) ................................................................ 13

*Western World Ins. Co. v. Stack Oil, Inc.*,
    922 F.2d 118 (2d Cir. 1990) ................................................................... 7

*Zeller v. Consolini*,
    59 Conn. App. 545 (2000) ............................................................... 16, 17

*Zino Davidoff SA v. CVS Corp*,
    571 F.3d 238 (2d Cir. 2009) ................................................................. 12

**Statutes**

15 U.S.C. §1125(c)(1)(2006) ...................................................................... 19, 21

15 U.S.C. §1125(c)(2)(A)(2006) ...................................................................... 20

15 U.S.C. §1125(c)(5)(2006) ............................................................................ 19

15 U.S.C. §1125(e)(2006) ................................................................................. 21

**Other Authorities**

*McCarthy on Trademarks and Unfair Competition*,
     §3:10 (4th ed. 2013) ................................................................................... 12

*McCarthy on Trademarks and Unfair Competition*,
     §25:42 (4th ed. 2013) ................................................................................. 11

Dunkin' Brands, Inc., DD IP Holder LLC and Dunkin' Brands Group, Inc. (collectively "Dunkin'"), submit this Memorandum of Law in support of their Motion for Summary Judgment.

## I.      PRELIMINARY STATEMENT

This lawsuit is well suited for resolution by summary judgment since the issue is simply whether DePasquale can prove the elements of her claims as a matter of law.  DePasquale contends that Dunkin' committed a tortious act by sending takedown notices to Amazon and eBay notifying them that her resale of its K-Cups on the Internet violates Dunkin's intellectual property rights.  The parties agree on the underlying facts, with the exception of the existence of Dunkin's quality control standards.   Dunkin' has submitted substantial evidence that it implements extensive quality control standards to ensure the integrity of its K-Cups.

All of DePasquale's claims are based on two takedown notices Dunkin' issued to eBay and Amazon advising them that the unauthorized resale of its K-Cups violates its intellectual property rights.  A seller who believes that a takedown notice was improperly issued typically files a claim for wrongful takedown of its listing.  Instead, DePasquale attempts to frame this as a violation of the Connecticut Unfair Trade Practices Act (CUTPA) because it is liberally construed.   Despite its liberal interpretation, a plaintiff must still meet the necessary requirements.  As a matter of law, DePasquale cannot prove the elements necessary to sustain her claims for tortious interference with contract, tortious interference with prospective economic advantage or violation of CUTPA.

DePasquale also seeks a declaratory judgment that her resale of Dunkin' K-Cups does not constitutes trademark infringement or trademark dilution.  The evidence demonstrates that Dunkin' is entitled to judgment in its favor on the trademark dilution claim as a matter of law

1

because Dunkin's trademarks are famous and DePasquale's resale of them is likely to dilute the quality of the marks by tarnishment.  This Court need not decide whether DePasquale's conduct constitutes trademark infringement since Dunkin' is not seeking damages from DePasquale at this time.

## II.    FACTUAL BACKGROUND

Dunkin' incorporates by reference the undisputed material facts set forth in its Local Rule 56(a)1 Statement[1]. The popularity of Dunkin' coffee is due to its flavor and aroma.  Since its coffee is perishable and its flavor and aroma can easily deteriorate, Dunkin' maintains strict quality control standards regarding the manufacture, distribution and storage of its coffee to prevent such deterioration, which would result in an inferior taste and aroma.

### A.    Dunkin's Due Diligence in Enforcing its Intellectual Property Rights

Dunkin' has used the DUNKIN' DONUTS trademark in association with restaurant and carryout food services since 1950 and owns a family of trademarks, including but not limited to its stylized DUNKIN' DONUTS orange and pink mark with frankfurter type/font, along with its steaming coffee cup mark and trade dress which use the same color combination, all of which are used on its K-Cup packaging.  Dunkin' owns U.S. federal trademark registrations for these trademarks.  Stmt. at 1-2.



---

[1] The designation "Stmt. at ." throughout this Memorandum references the specific paragraph in Dunkin's Local Rule 56(a)1 Statement and any exhibits referenced in said paragraphs.

Dunkin' has expended vast resources building and promoting its brand, including its trademarks and trade dress, which have extraordinarily high consumer recognition, so that the public associates them with the high quality of Dunkin' coffee.  Stmt. at 3.

Dunkin's coffee is perishable and its flavor and aroma deteriorate without the necessary environmental controls, resulting in a negative experience for the consumer that could irreparably damage Dunkin's reputation and goodwill.  Stmt. at 5.  Since Dunkin' cannot exercise quality controls over its coffee when resold by third parties, this constitutes an exception to the first sale doctrine and renders the resold coffee not genuine.  Since at least 2003, Dunkin' had established procedures to oversee the monitoring and enforcement of third parties that infringe the intellectual property of Dunkin' and/or dilute its trademarks by reselling Dunkin' coffee products on the Internet, both on giant ecommerce sites and individual websites.  Stmt. at 6-7.  This includes not only monitoring such sites but also sending the appropriate cease and desist letters to third party websites and takedown notices to ecommerce sites, such as Amazon and eBay.  Attached to the Declaration of Terry Ursino, Dunkin' Trademark Manager, are a few examples demonstrating Dunkin's diligence in policing its intellectual property rights throughout the years.[2]  Stmt. at 6-7.

Over time, the number of third parties reselling Dunkin' coffee on the Internet continued to increase.  Stmt. at 10.  Dunkin' retained Dr. Ted Labuza, a professor of food science with an expertise in coffee, to review and analyze Dunkin' quality control standards and the environmental factors that affect the quality of its coffee.  Stmt. at 10.  In February, 2005, Dr. Labuza prepared a comprehensive report that not only analyzed and explained the scientific basis of why coffee deteriorates as a result of environmental factors, such as temperature, moisture content and oxygen level, but that the deterioration negatively affects the freshness,

---

[2] The specific seller information has been redacted to protect the privacy rights of these third parties.

flavor and aroma of the coffee.  Stmt. at 13-15, 23.  His report explains in detail why coffee is a perishable food and the scientific basis for why Dunkin's inability to implement its quality standards can cause the coffee to deteriorate as a result of temperature, moisture content and oxygen level in the package. Stmt. at 16.  He also reviewed and evaluated the quality control standards implemented by Dunkin' for its coffee products and concluded they are excellent. Stmt. at 17.  Based on prior studies he conducted, he noted that if a consumer receives a bad product, there is good reason to believe he or she may no longer buy that brand.  Stmt. at 20, 24. Dr. Labuza concluded that when a third-party purchases Dunkin' coffee and attempts to resell it, since Dunkin' has no control over how the coffee is stored, this can affect its moisture and oxygen content and cause deterioration of its taste, aroma and freshness, which would have a highly detrimental effect on Dunkin's reputation.  Stmt. at 21, 25.

After Dunkin's K-Cups® were introduced in August, 2011, Dunkin' continued to monitor the Internet to detect efforts to resell its coffee and continued sending cease and desist letters to third party websites and takedown notices to ecommerce sites. Stmt. at 8-9.  Preventing the resale of its K-Cups is especially important since coffee packaged in its K-Cups is more susceptible to deterioration than coffee sold in bags due to the composition of the K-Cup packaging.  Stmt. at 32-34, 38.  Dunkin' retained an expert in the field of food packaging, Dr. Bruce Welt, to update Dr. Labuza's report to encompass the new packaging used for K-Cups. Stmt. at 26.  Dr. Welt reviewed Dunkin's quality control standards for its K-Cups from point of manufacture through controls maintained at the stores and concluded that Dunkin's quality standards for its K-Cups ensure product quality and customer satisfaction.  Stmt. at 27, 36.  He also analyzed the construction of Dunkin' K-Cups, as well as Dr. Labuza's report.  Stmt. at 26. He explained that the plastic polymers that comprise the cup portion of the K-Cups permit the

permeation of oxygen, nitrogen, water vapor, carbon dioxide and other gases.  As temperatures rise, these polymers soften and the permeation rate increases, which leads to an increased loss of freshness and aroma.  Stmt. at 32-33.  He concluded that when Dunkin' K-Cups are removed from its controlled system and Dunkin' no longer has the ability to exercise its quality standards, the K-Cups can be subjected to random and variable changes in temperature and relative humidity, which negatively affect the quality of its coffee, resulting in a poor experience for the consumer.  Stmt. at 34-35.  Finally, he concluded that few coffee packages afford as little protection from environmental factors as K-Cups.  As a result, Dunkin' K-Cups require even greater adherence to strict environmental controls during distribution and storage.  Stmt. at 38.

### B.        DePasquale's Resale of Dunkin' K-Cups

Since their introduction in August, 2011, Dunkin' K-Cups can only be purchased in corporate and franchise owned stores!  Stmt. at 40.  The resale of Dunkin' K-Cups qualifies as an exception to the first sale doctrine because Dunkin's inability to exercise quality control over the resold K-Cups can result in a potential defect in the coffee itself, causing its flavor and aroma to deteriorate.  This is the type of defect that a customer cannot detect until he or she purchases the K-Cups and drinks the coffee.  Stmt. at 37.  The resale of inferior coffee would be highly detrimental to Dunkin's brand and reputation and would tarnish its trademarks.  Stmt. at 5.

Consistent with its ongoing practice of policing its intellectual property rights, on May 29, 2013 Dunkin' sent a takedown notice to the Copyright Agent of Amazon requesting the removal of 14 K-Cup listings by Amazon Standard Identification Number ("ASIN").  Stmt. at 50.  Using these numbers, Amazon advised the merchant that offered eight of these listings, Havens Toys, that they had been removed because the products listed may infringe on trademark rights.  Stmt. at 51.  Pursuant to eBay's VeRO Program, on June 3, 2013, Dunkin' sent a Notice

of Claimed Infringement to eBay identifying four listings that offered its K-Cups for sale, by item number and seller ID.  Stmt. at 52.  eBay subsequently notified seller ID Nausetlighthouse that one of its listings was removed as a result of Dunkin's notice that it violated its intellectual property rights.  Stmt. at 53. Since 2007, DePasquale has sold a variety of products on Amazon and eBay under the usernames Havens Toys and Nausetlighthouse.  (Compl. at ¶¶ 10-11).  DePasquale first began selling Dunkin' K-Cups online on May 22, 2013. Stmt. at 60.  While DePasquale can no longer resell Dunkin' K-Cups on these sites, she continues to sell other products under these usernames.  Stmt. at 61.

When DePasquale contacted Dunkin' to protest, she was provided with a detailed explanation of why her resale of Dunkin' K-Cups constitutes an exception to the first sale doctrine.  Stmt. at 54-56.  Not satisfied with this response, her attorney sent a lengthy letter to Dunkin's counsel accusing Dunkin' of tortious conduct and violation of the Sherman Act.  Stmt. at 58.  On July 29, 2013, DePasquale filed the instant Complaint, alleging that Dunkin's action of issuing takedown notices for her offers to resell Dunkin' K-Cups online is tortious and violates CUTPA.

## III.   ARGUMENT

### A.   <u>Standard of Review for Summary Judgment</u>

As the Supreme Court stated, summary judgment is not a disfavored procedural shortcut but an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548 (1986).  Three Supreme Court cases ushered in a "new era" in the standard of review for summary judgment and effectively lowered the movant's burden.  *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) and *Celotex Corp.*, *supra*.  Once the movant

has met its initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmovant's case, the burden shifts to the nonmoving party. *Anderson*, 477 U.S. at 324. The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts" and "may not rest upon mere allegations or denials of his pleading." *Matsushita*, 475 U.S. at 586; *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993). As the Court observed in *Anderson*, "The materiality determination rests on the substantive law, and it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." 477 U.S. at 324. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue to determine whether a resolution could affect their disposition. *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990). If the evidence presented is merely colorable or not significantly probative, summary judgment is proper.

When the burden of proof at trial would fall on the nonmoving party, it is sufficient for the movant to point to a lack of evidence on an essential element of the nonmovant's claim. *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). Mere speculation and conjecture is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997), quoting *Western World Ins. Co. v. Stack Oil, Inc.* 922 F.2d 118, 121 (2d Cir. 1990). "It must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992). Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994). Summary judgment is "the put up or shut up moment in a lawsuit, when a party

must show what evidence it has that would convince a trier of fact to accept its version of

events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005).

**B.      DePasquale Cannot Prove the Elements of Tortious Interference With
         <u>Contract</u>**

In order to state a claim for tortious interference with contract under Connecticut law,

certain elements are required.  "Not every action that disturbs a contract or business expectancy

is actionable." *Robert S. Weiss & Associates, Inc. v. Wiederlight.*  A plaintiff must demonstrate:

1.   The existence of a contractual or beneficial relationship;

2.   Defendant's knowledge of the relationship;

3.   Defendant's intent to interfere with the relationship;

4.   That the interference was tortious; and

5.   That plaintiff suffered a loss that was caused by defendant's tortious conduct.

*Appleton v. Bd of Educ. of Town of Stonington*, 254 Conn. 205, 212-13, 757 A.2d 1059, 1063

(2000).  In order to show that the interference was tortious, a plaintiff must demonstrate that the

defendant had an improper motive or used improper means in carrying out the interference.  As

the Court explained in *Wiederlight*:

> [F]or a plaintiff to successfully prosecute such an action it must
> prove that the defendant's conduct was in fact tortious.  This
> element may be satisfied by proof that the defendant was guilty of
> fraud, misrepresentation, intimidation or molestation…"[A]n
> action for intentional interference with business relations…requires
> the plaintiff to plead and prove at least some improper motive or
> improper means…'[A] claim is made out [only] when interference
> resulting in injury to another is wrongful by some measure beyond
> the fact of the interference itself.
> 208 Conn. at 536.

This element requires "proof that the defendant was guilty of fraud, misrepresentation,

intimidation or molestation…or that the defendant acted maliciously."  *Blake v. Levy*, 191 Conn.

257, 260-261, 464 A.2d 52, 54 (1983); *Milso Industries Corp. v. Nazzaro*, 2012 U.S. Dist. LEXIS 123999, *38-39 (D. Conn.).

As illustrated in Section III(D)(1) of this Memorandum, Dunkin' had a legitimate basis for issuing the takedown notices – to protect its intellectual property rights.  It has consistently policed the improper resale of its K-Cups since they were introduced in August, 2011.  Stmt. at 8-9.  Thus, DePasquale cannot carry her burden of proving that Dunkin' acted maliciously or had an improper motive and Dunkin' is entitled to judgment.

### C. Dunkin' Cannot Prove the Elements of Tortious Interference With Prospective Business Advantage

Just as with her tortious interference with contract claim, to substantiate this claim DePasquale must prove that Dunkin' had an improper motive and that it committed a tort.  *Milso Industries*, 2012 U.S. Dist. LEXIS 123999 at *40-41.  DePasquale has no evidence of fraud, misrepresentation or intimidation by Dunkin'.  *Biro v. Hirsch*, 62 Conn. App. 11, 21, 771 A.2d 129, 136 (2001).  DePasquale cannot carry her burden of showing that the alleged interference is wrongful by means other than the interference itself.  *Blake v. Levy, supra*.  See also *Sportsmen's Boating Corp. v. Hensley*, 192 Conn. 747, 755, 474 A.2d. 780, 786 (1984) (liability in tort imposed only if defendant acted maliciously).  DePasquale cannot carry its burden of proving that Dunkin' acted with an improper motive or interfered without any justification.  Thus, Dunkin' is entitled to judgment.

### D. Dunkin' is Entitled to Judgment on the CUTPA Claim

Each of DePasquale's claims is based on the same conduct – Dunkin's issuance of two takedown notices.  DePasquale has woefully failed to provide any evidence to support a CUTPA violation.  In analyzing whether a plaintiff can sustain such a claim, courts weigh the following three factors: (1) whether it offends public policy/the "established concept of unfairness"; (2)

whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers or competitors. *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433-34, 849 A.2d 382 (2004).  With respect to the third factor, the Court explained in *A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 216-17, 579 A.2d 69, 77 (1990), that to justify a finding of unfairness, the injury must be substantial and must not be outweighed by any countervailing benefit to consumers or competition that the practice produces.  In addition, mere negligence is insufficient to establish liability under CUTPA. *Id.*; *Star Child II, LLC v. Lanmar Aviation, Inc.*, 2013 U.S. Dist. LEXIS 36476, *17 (D. Conn.).  In the instant case, Dunkin' has a right and duty to police and enforce its intellectual property rights and had an objective good faith basis for issuing these takedown notices.  Stmt. at 5-9, 55.

### 1.    Dunkin' Had an Objective Good Faith Basis for its Conduct

A trademark is a short-hand designation of a brand.  It conveys information that allows the consumer to say, "I need not investigate the attributes of the product I am about to purchase because the trademark tells me that the attributes are the same as that of the products I enjoyed earlier." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 205 (1942); *Kraft Foods Group Brands, LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 739 (7th Cir. 2013).  The first sale doctrine provides that a third-party may resell genuine goods bearing the trademark owner's mark without the owner's authorization.  However, this doctrine does not apply if the trademark owner can demonstrate that the goods sold by the third-party may deteriorate and the trademark owner was denied the opportunity to exercise its quality controls or if the goods contain a material difference.  In such a case, the goods are not considered "genuine".  There are two theories of trademark infringement and/or trademark dilution recognized by the Second Circuit that render goods not "genuine" for trademark purposes:  (1)

when the trademark owner cannot exercise its quality control standards; and (2) when the goods are materially different from the authentic goods.  The latter theory is most often applied to gray market goods.  *Dan-Foam A/S and Tempur-pedic, Inc. v. Brand Named Beds, LLC*, 500 F.Supp.2d 296, 315 (S.D.N.Y. 2007), contains an in-depth analysis of the two theories.  In the instant case, DePasquale's resale of Dunkin' K-Cups qualifies as an exception to the first sale doctrine under the quality control theory.

All of the key decisions applying the quality control theory cite *El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395, (2d Cir. 1986), in which El Greco, a shoe manufacturer, sued defendant for selling its shoes without authorization.  The district court held that the shoes in question were genuine and defendant did not commit trademark infringement.  The Second Circuit reversed, concluding that the district court erred as a matter of law when it held that the shoes sold by defendant without El Greco's permission were "genuine".  This is because El Greco was denied the opportunity to exercise its quality control procedures.  In explaining the rationale for its decision, it stated:

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. . . . For this purpose, the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.

This is known as the El Greco Rule.  J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §25:42 (4th ed. 2013).  The Fourth Circuit adopted this reasoning in *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991), in finding that defendant had infringed Shell's trademarks.  While the oil it sold was made by Shell, it was not considered "genuine" because Shell did not have the ability to exercise its quality standards.  Even though

the defendant employed its own quality controls, the Court emphasized that quality standards must be controlled by Shell for the product to be considered genuine.

The Second Circuit has emphasized that a plaintiff can prove trademark infringement even though the goods in defendant's hands have not in fact deteriorated, because it is the **opportunity** to control quality that is missing.  As a result, a product is not truly "genuine" unless it has been manufactured and distributed under quality controls established by the manufacturer.  *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir. 1994)[3]; J. Thomas McCarthy, *McCarthy on Trademarks*, at §3:10 (4th ed. 2013).  See also, *Ahava, Inc. v. J.W.G. Ltd.*, 250 F.Supp.2d 366, 369-370 (S.D.N.Y. 2003).

In *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, (2d Cir. 2009), the Court held that plaintiff is likely to succeed on its trademark infringement claim as the result of the sale by CVS of plaintiff's COOL WATER fragrances under both the quality control and material difference theories.  It explained that a trademark holder is entitled to an injunction against one who abrogates its quality control measures upon a showing that (1) the asserted quality control procedures are established, legitimate, substantial and nonpretextual; (2) it abides by these procedures; and (3) sales of products that fail to conform to these procedures will diminish the value of the mark.  In doing so, it emphasized that a trademark holder's claim is not defeated because of a failure to show that the goods sold were defective.  This is because the use of a trademark over time assures consumers that the goods conform to the mark holder's quality standards.  *Id*. at 243-244.  Because *CVS* had also removed plaintiff's production codes from certain of the packages, the goods were also "materially different".  *CVS* argued that plaintiff had not shown that any of its sales involved inferior product.  Citing to *El Greco*, the Court explained

---

[3]  The Court affirmed denial of a preliminary injunction in *Polymer* because plaintiff essentially admitted that it did not carefully police its quality controls.

that such proof is unnecessary because "the mark holder is entitled to protection against acts that subvert its ability to protect the reputation of its marks by exercising quality controls." *CVS*, 571 F.3d at 245-246.

The value of a trademark is the savings and search costs made possible by the information the trademark conveys about the quality of the owner's brand. These benefits depend on the trademark owner's ability to maintain consistent quality. When a brand's quality is inconsistent, consumers become unwilling to pay more for the brand. *Kraft Foods Group Brands,* 735 F.3d at 739. This is why the resale of Dunkin' K-Cups, which the evidence demonstrates are perishable and are susceptible to environmental factors, without the opportunity for Dunkin' to exercise its quality controls renders these K-Cups not genuine. Stmt. at 35-38. The failure to exercise quality control is the kind of act that can result in the loss of trademark rights. *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134, 140 (3rd Cir. 1981).

## 2.     The Evidence Shows that Dunkin' Implements Legitimate Quality Controls

Dunkin' has come forward with overwhelming evidence demonstrating that it has legitimate, established and substantial quality control procedures, abides by these procedures and that K-Cups that do not conform to these procedures will deteriorate and cause serious harm to its trademarks. Stmt. at 37, 39, 41-49. In her Complaint, DePasquale contends that the Dunkin' K-Cups she resold were purchased at a Dunkin' store and were sold within the "best used by" date. (Compl. at ¶¶ 13, 28). Assuming for the purpose of this Motion only that this is true, it misses the point. What matters is that Dunkin' does not have the ability to exercise its rigorous quality control standards over resold K-Cups. Because its coffee is perishable, and when packaged in K-Cups is more susceptible to deterioration from environmental factors, Dunkin' K-Cups resold without Dunkin's ability to exercise its own quality standards are not considered

13

"genuine" and constitute an exception to the first sale doctrine.  Stmt. at 13, 31, 38.  As the case law demonstrates, Dunkin' is not required to prove that the K-Cups sold by DePasquale were defective, only that Dunkin' could not implement its quality standards.

While DePasquale repeatedly states in her Complaint that Dunkin' essentially has no quality controls, does not conduct tests regarding K-Cups' exposure to environmental elements and does not provide guidelines to its stores regarding temperature, humidity, etc., it provides no factual support for these statements and they are patently false and contradicted by the evidence. (Compl. ¶¶ 19-27).  Dunkin' has extensive quality control procedures in place for the production, distribution and storage of its K-Cups, which include uniform processes and procedures to ensure that the K-Cups meet specifications for head space oxygen, seal integrity and moisture percentage.  Stmt. at 39, 41-48.  These include its *Confidential Product Specification for Dunkin' Donuts Original Blend K-Cups*; *Confidential Manual for Dunkin' Donuts Standard for DD K-Cups Quality Evaluation*; *Keurig K-Cups Quality Program – Recommended Best Practice & Required Protocol*; *Dunkin' Pocket Operations Guide;* and *Confidential Product Specification for Dunkin' Donuts DD Hot Cocoa K-Cups*.  Stmt. at 41-47.  The Declaration of Kathleen LeClair, Dunkin's Director of Global Quality Management, attests to the substantial quality controls in place and their implementation.  Stmt. at 40.

Further, each batch of K-Cups manufactured by Green Mountain Coffee Roasters, Inc. for Dunkin' is tested by an independent laboratory, which verifies oxygen level, moisture, weight, date code and cup and filter integrity, among other specifications.  Stmt. at 43.  The quality control documents also mandate the temperature for distribution and storage, as well as recommended relative humidity.  Stmt. at 44.  In addition, Dunkin' issues directives to all stores regarding room temperature and relative humidity that must be maintained in the stores.  Stmt. at

14

46-47.  This information is contained in the shelf life grid, part of the Operations Guide provided to all stores, which also provides the "best by" date for K-Cups.  Stmt. at 47.  Store managers are required to monitor shelf life of all coffee products on a daily and monthly basis and the stores are audited by a Dunkin' Operations Manager throughout the year.  Stmt. at 48.  Finally, Dunkin' K-Cups are subjected to sensory testing multiple times each month at Dunkin's facility in Canton, Massachusetts.  Stmt. at 45.

This evidence overwhelmingly establishes that Dunkin' implements stringent quality control standards for its K-Cups, including maintaining temperature and humidity level at all stores, as confirmed by Ms. LeClair and the expert reports of Dr. Labuza and Dr. Welt.  Stmt. at 17, 22-23, 35-36, 39-49.  As these expert reports clearly illustrate, Dunkin's inability to exercise its quality controls over the resale of its K-Cups is likely to result in deterioration of the freshness, flavor and taste of its K-Cups.  Stmt. at 25, 37.  In the highly competitive U.S. coffee market, Dunkin' has been repeatedly recognized as number one in customer loyalty in the coffee category by the Brand Keys Customer Loyalty Engagement Index.  Stmt. at 4.  The unauthorized resale of its coffee by third parties, such as DePasquale, would have a highly detrimental effect on its brand.  Stmt. at 5.  For these reasons, the resale of Dunkin' K-Cups constitutes an exception to the first sale doctrine in accordance with Second Circuit case law.  While the evidence submitted by Dunkin' demonstrates this, Dunkin' need only show that it had a reasonable basis for sending the takedown notices at issue to defeat DePasquale's CUTPA claim.

### 3.      Dunkin's Exercise of its Legal Rights Cannot Form a Basis for Violation of CUTPA

The proper exercise of one's legal rights also serves to defeat a CUTPA claim.  In the instant case, Dunkin' has demonstrated that it had a well founded legal basis for issuing the takedown notices.  The Court in *Ancona v. Manafort Bros.*, 56 Conn. App. 701, 746 A.2d 184,

*cert. denied*, 242 Conn. 953, 749 A.2d 1202 (2000), held that defendant's filing of a lawsuit with probable cause could not form the basis for a CUTPA violation.  The defendant had previously sued plaintiff for breach of contract and plaintiff was granted summary judgment.  The Court emphasized that defendant's conduct in filing suit was not unlawful nor did it offend public policy or some established concept of what is fair.  Without a showing that the party's actions amounted to more than at least a colorable attempt to preserve legal rights, there is no basis to assert a CUTPA violation.

Public policy favors protecting one's right to bring a legitimate lawsuit or take other action to protect one's rights.  In *Suburban Restoration Co., Inv. v. ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983), the Second Circuit addressed whether filing a groundless lawsuit can constitute an unfair trade practice under CUTPA.  Analyzing the issue with reference to the *Noerr-Pennington* doctrine and underlying First Amendment concerns, it held that the filing of a single non-sham lawsuit cannot form the basis of either a CUTPA claim or tortious interference with business expectancy under Connecticut common law.  The Court in *Zeller v. Consolini*, 59 Conn. App. 545, 553-54, 758 A.2d 376 (2000) adopted this rule.  Similarly, in *Consolidated Insurers, Inc. v. Winch*, 2004 Conn. Super. LEXIS 2785, *6 (Conn. Super. Ct.), a former employee directly competed in the same industry.  The employer sent him a cease and desist letter based on a non-compete clause in his contract and subsequently sued him.  The former employee filed a CUTPA counterclaim and the employer moved to strike it as insufficient to state a cause of action under the statute.  The Court agreed, holding that the issuance of a letter threatening to sue and then filing suit was not objectively baseless and did not satisfy any criteria for a CUTPA claim.

The law in Connecticut is that the filing of a single "non-sham" lawsuit is not a basis for a CUTPA claim.  As this Court explained in *Milso Industries*, "sham" litigation in the CUTPA context consists of "actions rife with abusive intent and absent any indicia of success", citing *Zeller*, 59 Conn. App. at 555.  This Court held that Milso's action did not qualify as a "sham" lawsuit because it is not "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."  *Milso Industries*, 2012 U.S. Dist. LEXIS 123999, *66, citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 50, 113 S. Ct. 1920 (1993).  In *Primetime 24 Joint Venture v. NBC,* 219 F.3d 92, 97, 100 (2d Cir. 2000), the Second Circuit extended the protections offered by *Noerr Pennington* to pre-litigation threat letters and a system of monitoring and enforcing defendants' rights under the Copyright Act. See also, *DIRECTV, Inc. v. Lewis*, 2005 U.S. Dist. LEXIS 8187, * 15-16 (W.D. N.Y.) and *Barq's, Inc. v. Barq's Beverages, Inc.*, 677 F.Supp. 449, 452-53 (E.D. La. 1987) (applying pre-litigation rights to enforcement of trademark litigation.)

DePasquale's entire suit is based on nothing more than Dunkin's exercise of its legal right to police and enforce its intellectual property.  As the evidence demonstrates, the two takedown notices were sent in the ordinary course of business.  Stmt. at 6-9, 50, 52, 55.  DePasquale was not targeted since Dunkin' did not even know her identity.  Stmt. at 50-54, 57.  Dunkin' has consistently monitored attempts to resell its coffee on the Internet, including its K-Cups, for a number of years and continues to do so to police and protect its intellectual property rights.  Stmt. at 6-9.  The takedown notices identified the K-Cup listings by item number and/or seller ID.  Stmt. at 50-53.  Under no set of circumstances can Dunkin's exercise of its legal rights be considered immoral, unethical, oppressive or unscrupulous.  Further, Dunkin' has demonstrated that its actions clearly qualify as an exception to the first sale doctrine, as

articulated by the Second Circuit, that is, the resale of a product subject to deterioration constitutes an exception when the trademark owner does not have the ability to oversee/implement quality control standards.  Finally, since DePasquale cannot prove the necessary elements of her tort claims, the CUTPA claim must fail because the factual predicate is the same for all three claims.  *Gomes v. Commercial Union Ins. Co.*, 258 Conn. 603, 620; 783 A.2d 462, 473 (2001).

### 4.      Enforcement of Dunkin's Intellectual Property Rights Benefits Consumers

Most significant, Dunkin's actions provide a substantial benefit to Connecticut consumers.  Dunkin's trademarks signal to consumers that its coffee has the characteristics that they have come to associate with Dunkin'.  When consumers purchase Dunkin' K-Cups they expect to receive those characteristics every time.  The policy behind the enactment of CUTPA is to protect consumers.  DePasquale is attempting to subvert the purpose of the statute by seeking to punish Dunkin' for doing the right thing.  Had Dunkin' failed to send takedown notices and simply allowed third parties to resell its K-Cups, consumers could be harmed.  Trademarks are symbols of quality that assure the consumer he or she is getting the consistent quality expected. If the trademark owner provides an inconsistent level of quality below what consumers expect from prior experience, consumers are disappointed and the trademark is devalued.  *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429-30 (7th Cir. 1985), *cert. denied*, 475 U.S. 1147 (1986).  Dunkin's inability to exercise its quality controls over the resale of its K-Cups can result in defects that a customer cannot detect until he or she purchases and drinks the coffee. Stmt. at 25, 37.  This not only damages Dunkin's reputation but eviscerates the benefit of Dunkin's trademarks to consumers and subverts the purpose of both CUTPA and the Lanham Act.

**E.     The Unauthorized Resale of Dunkin' K-Cups Constitutes Trademark Dilution**

The Complaint seeks a declaratory judgment that DePasquale's action of reselling Dunkin' K-Cups does not constitute trademark infringement or trademark dilution. Dunkin' seeks judgment in its favor on the trademark dilution claim since it entitles it to enjoin DePasquale's actions.[4]   Prior to October, 2006, the federal anti-dilution statute entitled the owner of a famous mark to injunctive relief if another person's commercial use in commerce of a mark **causes dilution** of the distinctive quality of the famous mark.  *Malletier v. Dooney & Bourke, Inc.*, 500 F.Supp.2d 276, 279 (S.D. N.Y. 2007).   On October 6, 2006, Congress enacted the Trademark Dilution Revision Act of 2006 (TDRA), which provides that:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, **commences use of a mark or trade name in commerce that is likely to cause** dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.
> 15 U. S.C. § 1125(c)(1)(2006)(emphasis added).

A key reason the Act was revised was to replace the "actual dilution" requirement with the less stringent "likely to cause dilution" standard.  *Tiffany (NJ), Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 522-23 (S.D. N.Y. 2008).  In addition to injunctive relief, it also entitles the famous mark owner to monetary damages if the conduct is willful.  15 U.S.C. § 1125(c)(5).

To establish a violation of the TDRA, a mark owner must provide sufficient evidence that (1) the mark is famous; (2) defendant's use of the mark is in commerce; (3) the defendant used the mark after it was famous; and (4) defendant's use is likely to dilute the quality of the mark by blurring or tarnishm.  15 U.S.C. §1125 (c)(1); *Tiffany* (NJ) *Inc. v. eBay, Inc.*, 600 F.3d 93,

---

[4] This Court need not address trademark infringement since Dunkin' is not seeking damages from DePasquale at this time.

110-11 (2d Cir.), c*ert. denied*, 131 S.Ct. 647 (2010).  In order for a mark to be considered famous under the TDRA, it must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. §1125(c)(2)(A); *Burberry Ltd. v. Euro Moda, Inc.*, 2009 U.S. Dist. LEXIS 53250, *34 (S.D. N.Y.); *L'Oreal USA, Inc. v. Trend Beauty Corp.*, 2013 U.S. Dist. LEXIS 115795, *44-45 (S.D.N.Y.); *Bose Corp. v. Ejaz,* 2012 U.S. Dist. LEXIS 130953, *31-33 (D. Mass.). The TDRA sets out the four non-exclusive factors that courts consider in determining fame: (1) the duration, extent and geographic reach of advertising and publicity of the mark; (2) the amount, volume and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered.  15 U.S.C. § 1125(c)(2)(A). "Courts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public."  *Heller, Inc. v. Design Within Reach, Inc*., 2009 U.S. Dist. LEXIS 71991 (S.D. N.Y.).

Dunkin' is the owner of the trademark DUNKIN' DONUTS in its stylized frankfurter type/font in orange and pink, along with its steaming coffee cup mark and trade dress, which use the same color combination, all of which are used on its K-Cup packaging. Stmt. at 1.  It has used the DUNKIN' DONUTS mark since 1950 and owns multiple U.S. federal trademark registrations for these marks.  Stmt. at 1-2.  Just as the Burberry mark was entitled to a presumption of inherent distinctiveness by virtue of its incontestability, the same is true of the DUNKIN' DONUTS trademarks.  In addition to distinctiveness, the DUNKIN' DONUTS marks possess other indicia of fame.  Dunkin' has a strong retail presence in the United States – with 7,677 corporate or franchise owned stores.  Stmt. at 46.  It also has a prominent advertising

presence in the United States.  Stmt. at 62.  It advertises extensively on TV, radio, in print media,

billboards, social media and the Internet, all of which bear the Dunkin' Donuts marks.  Stmt. at

62.  From 2009 through 2013, Dunkin' has spent hundreds of millions of dollars on such media

advertising[5].  Stmt. at 63.  During the same period, its franchise store sales in the U.S. were in

the billions of dollars.  Stmt. at 64.  It also has a significant presence on social media, with

11,125,492 followers on Facebook and 472,961 followers on Twitter.  Stmt. at 65.  In addition,

over 5.7 million users have downloaded Dunkin's mobile app and millions of consumers are

active recipients of Dunkin's DD Update newsletter[6].     Stmt. at 66.

Dunkin' has expended vast resources promoting its brand, including its trademarks and

trade dress, which have extraordinarily high consumer recognition.  Stmt. at 3.  The public

associates these trademarks with the high quality of Dunkin' coffee.  For the last eight years,

Dunkin' has been recognized as number one in customer loyalty in the coffee category by the

Brand Keys Customer Loyalty Engagement Index.  Stmt. at 4.  There is no question that Dunkin'

trademarks qualify as famous, that DePasquale used the marks after they became famous and

used them in commerce in an effort to resell Dunkin' K-Cups on Amazon and eBay.

While Dunkin' has also shown that DePasquale's resale of its K-Cups constitutes dilution

by tarnishment, under the TDRA Dunkin' need only show her actions are **likely to dilute** its

marks.  Dilution by tarnishment occurs when there is an "association arising from the similarity

between a mark or a trade name and a famous mark that harms the reputation of the famous

mark."  15 U.S.C. §1125(e) 2006.  A trademark may be tarnished when it is linked to products of

shoddy quality or is portrayed in an unwholesome or unsavory context, with the result that the

---

[5] In order to avoid filing this Memorandum under seal, the specific dollar amounts of advertising expenditures and U.S. franchise store sales are contained in the Rule 56(a)1 Statement.
[6] In order to avoid filing this Memorandum under seal, the specific number of consumers who receive the DD Update newsletter is contained in the Rule 56(a)1 Statement.

public associates the lack of quality of DePasquale's resold coffee with Dunkin' genuine coffee. *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).  A mark may also become tarnished if it loses its ability to serve as a "wholesome identifier" of plaintiff's product.  *Id.*  The Second Circuit has expressly held that tarnishment is not limited to shoddy conduct.  Rather, it takes a broad view of dilution by tarnishment.  *Id.*.  *Dan-Foam*, 500 F.Supp.2d at 307-309.  Evidence of tarnishment includes a finding that the famous mark will suffer negative associations through the offender's use.  *Hormel Foods,*, 73 F.3d at 507; *Burberry Ltd., supra.*  In *Burberry,* defendants sold counterfeit products bearing exact replicas of Burberry's marks.  Burberry sought summary judgment on liability only.  The Court granted judgment in its favor on its dilution by tarnishment claim, entered a permanent injunction and Burberry was given leave to move for an inquest on damages.  2008 U.S. Dist. LEXIS 53250, *38-42.

The Second Circuit has consistently held that in the instant circumstances, DePasquale's resale of Dunkin' K-Cups without the ability of Dunkin' to oversee quality standards renders these K-Cups not "genuine" and an exception to the first sale doctrine.  As illustrated by the expert reports of Dr. Labuza and Dr. Welt, there is also no question that reselling Dunkin' K-Cups without the ability of Dunkin' to exercise its quality standards is likely to result in deterioration of its K-Cups, resulting in an inferior product.  Stmt. at 37.  As such, DePasquale's conduct is likely to dilute Dunkin's trademarks by tarnishing Dunkin's brand, reputation and goodwill, which it spent many years to achieve.

While DePasquale will argue that Dunkin' cannot show the Dunkin' K-Cups she sold were inferior, the law does not require Dunkin' to do so.  Dunkin' built its brand on the freshness, flavor and aroma of its coffee.  There is no practical way for Dunkin' to locate and test

K-Cups resold by third-parties on the Internet — by the time it identifies the resellers, the coffee has been sold.  More important, the law does not require Dunkin' to do this.  Dunkin's dilemma is why the FTDA was amended, as illustrated by statements made at Congressional hearings on the proposed amendment, including a statement made by a representative of the International Trademark Association (INTA).  INTA supported changing the Act so that a plaintiff need prove only a likelihood of dilution so that famous mark owners could "prevent dilution at its incipiency" and not be forced to "wait until the harm has advanced so far that…the recognition of the mark…is permanently impaired".  *Committee Print to Amend the Federal Trademark Dilution Act: Hearing Before the H. Subcomm. on Courts, the Internet and Intellectual Property of the H. Comm. on the Judiciary, 108th Cong. 10 (2004) (Statement of Jacqueline A. Leimer, INTA)*.

When its K-Cups are resold, Dunkin' is denied the opportunity to exercise its quality standards and the evidence shows that they are susceptible to deterioration if the appropriate environmental factors are not maintained.  As such, by definition DePasquale's resale of Dunkin' K-Cups is likely to dilute Dunkin's trademarks.  The purpose of the TDRA is to prevent dilution at its incipiency, not to wait until the damage has been done.  For these reasons, Dunkin' is entitled to an injunction against DePasquale because her actions are likely to dilute Dunkin's famous trademarks as a matter of law.  *Id.* 15 U.S.C. §1125(c)(1).

**IV.     CONCLUSION**

For the foregoing reasons, Dunkin' respectfully requests that this Court enter judgment in its favor on all claims of the Complaint.

**Dunkin' Brands, Inc., DD IP Holder LLC, and Dunkin' Brands Group, Inc.,**

By: /s/ Jacqueline Criswell

TRESSLER LLP
Jacqueline Criswell (phv06304)
233 S. Wacker Drive, 22nd Floor
Chicago, Illinois 60606
Tel: (312) 627-4000
Fax: (312) 627-1717
jcriswell@tresslerllp.com

and

SHIPMAN & GOODWIN LLP
Patrick Fahey (ct13862)
One Constitution Plaza
Hartford, Connecticut 06103
Tel: (860) 251-5824
Fax: (860) 251-5219
pfahey@goodwin.com
Their Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated below. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Jacqueline Criswell
TRESSLER LLP
233 S. Wacker Drive, 22nd Floor
Chicago, Illinois 60606
Tel: (312) 627-4000
Fax: (312) 627-1717
jcriswell@tresslerllp.com

24